| | |
|---|---|
| United States District Court | Southern District of Texas |

| | | |
|---|---|---|
| Louvenia Green, | § | |
| | § | |
| Plaintiff, | § | |
| versus | § | Civil Action H-04-4506 |
| | § | |
| | § | |
| Sterling Chemicals, Inc., | § | |
| | § | |
| Defendant. | § | |

# Opinion on Summary Judgment

*1.   Introduction.*

A black woman was fired. She claims it was because of her race, sex, and age. Her employer says it was because she violated its anti-harassment policy. The employer has moved for summary judgment and will prevail.

*2.   Background.*

In November 1976, Louvenia Green began working as a laboratory analyst at the Monsanto Company's plant in Texas City, Texas. She tested chemicals and sent the results to a chemist for interpretation. She earned an hourly wage and belonged to a union. The chemists earned a salary and did not belong to a union. In 1986, Sterling Chemicals, Inc., acquired the plant, and Green continued to work there.

During the summer of 1992, three lab workers told their supervisor, Cyndi Kibikas, a white woman, that Green had harassed them. Patty Evans said that Green had cornered her and had threatened her with a syringe. Lynette Maxwell said that Green had called her a scab and said she did not want to see Lynette because it made her sick. Carolyn Klotzman said that they had argued about vacation time.

In response, Kibikas met with Green and asked her about these complaints. Although Green denied the allegations, Kibikas warned her that future harassment would result in disciplinary action, including termination. The next month, Green filed a grievance with her union. She said that following the complaints Kibikas had scrutinized

her work excessively and had threatened her. Sterling and the union investigated her grievance, but found nothing to support her claims. Green admits that Kibikas never made any derogatory racial remarks to her.

In 1994, Sterling selected Green for leadership training. She took seminars and helped other workers get similar training. From 1994 to 1996, Green was a union steward. In 1996, Sterling changed her title to chief analyst and gave her a raise. Green says that the change included supervisory responsibilities. Sterling says her job remained the same and that the new title and pay raise were because of her seniority.

In 1996, an inspection of Sterling's operations revealed that production costs, including laboratory analyses, were too high. At the same time, changes in federal environmental standards and customer needs were demanding increasingly complex and accurate measurements from more sophisticated equipment. In response, Sterling announced plans to reorganize the laboratory. It encouraged workers to improve their skills, increase efficiency, and decrease overtime. In return, Sterling agreed to work with the union to keep jobs at the plant. Sterling's plans also called for increased cooperation and communication between hourly workers – including analysts – and chemists.

As with earlier attempts at change, Sterling anticipated that some of the workers would resist these changes and pressure other workers to do the same. Sterling issued several memoranda to remind workers about its anti-harassment policy. The policy specifically prohibited harassment, verbal abuse, and disruption of the workplace.

In May 1997, Irma Valdez – a Hispanic analyst – told management that Barbara Winston – a black analyst – had harassed her. This complaint prompted an investigation of the entire laboratory. Sterling interviewed 39 of its workers. Many described the laboratory as a hostile and intimidating place. Twenty-one workers identified Green as a primary contributor to the problems. They said she (a) had screamed at her coworkers and had cornered them during arguments; (b) had told them that they were not allowed to talk to salaried workers – chemists and management; (c) had called them spies, moles, and pimps when they did; and (d) had called one coworker a traitor for working with management. Some said they avoided talking to management about the laboratory's problems because they feared retaliation from Green. Many said they did not eat in the lunch room because Green verbally abused them.

Other workers reported that Green concentrated her attacks on new, often younger, analysts with more education and training than her. Mike Pattison, who managed the lab from 1992 to 1996, surmised that this was because she and the older analysts felt unqualified for the coming changes and, therefore, threatened by these new, younger analysts.

Sterling completed the investigation on June 5, 1997. Green and Winston were fired the same day; three other black women were also disciplined. The next day, Green filed a grievance with her union. She claimed that Sterling had fired her because she is black. The union arbitrated her grievance. Several witnesses testified at the hearing, including Green. The arbitrator found that Sterling had properly terminated Green and had not racially discriminated against her.

While the grievance was pending, Green also filed a discrimination charge with the Equal Employment Opportunity Commission. She claimed that Sterling fired her because of her race, sex, and age. In September 2001, the Commission notified Green of her right to sue. Due to Sterling's bankruptcy proceedings, Green's suit was delayed until now.

4.   *Barred Claims.*

Green claims that Sterling discriminated against her because of her race, sex, and age when it denied her application for a promotion, refused to train her, excessively scrutinized her work, and ignored her complaints. These claims are barred because (a) they were not included in Green's complaint to the Commission, and (b) they relate to events that happened more than 300 days before she filed her charge.

Before a worker may file a complaint under Title VII or the Age Discrimination in Employment Act, he must file a charge with the Commission describing the discriminatory conduct of his employer. *See* 29 U.S.C. § 626; 42 U.S.C. §§ 2000e-5(a)-(e). Failure to assert a claim bars that claim in a civil suit. *See Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Texas*, 40 F.3d 698, 711-12 (5th Cir. 1994). Here, Green's charge asserted only that Sterling discriminated against her by firing her, limiting the date of discrimination to June 5, 1997 – the day she was fired. It did not allege discriminatory conduct related to promotions, training, scrutiny of her work, or

complaints. Because Green did not assert these claims in the charge and they are unrelated to her termination, Green is barred from asserting them now.

Furthermore, a worker must file a charge with the Commission within 300 days of the discriminatory conduct. *See* 29 U.S.C. § 626(d); 42 U.S.C. § 2000e-5(e)(1). Claims that are not filed within 300 days are also barred in a civil suit. *Webb v. Cardiothoracic Surgery Assocs. of N. Texas*, 139 F.3d 532, 537 (5th Cir. 1998). Green filed her charge on June 18, 1997. She now complains about things that happened in 1992, approximately five years before she filed the charge. Because these claims were not asserted within 300 days, Green is precluded from asserting them now.

3.  *Race.*

Green argues that Sterling fired her because she is black. The record offers no support for this claim. When Green harassed three coworkers in 1992, Sterling warned her that future harassment could result in termination. Sterling again reminded her and others in 1996 that harassment of coworkers would not be tolerated. Green knew about the policy and the possible consequences, yet she openly chose to violate it. During the investigation, twenty-one workers identified Green as a primary source of hostility in the laboratory. They reported detailed accounts of her intimidation. Green also undermined changes in the laboratory by harassing better-educated and better-trained analysts and creating fear of retaliation in anyone who complained to management. These actions were overt and obnoxious and justified termination.

Furthermore, the record shows that Sterling consistently employed black men and women. Green herself had worked for Sterling since it acquired the facility in 1986, and black men and women continued to work at Sterling after her termination. Even with her history of harassment, Sterling chose Green for leadership training in 1994 and raised her pay in 1996. A discriminatory motive for her termination is unfounded. Sterling just finally responded to numerous complaints of harassment about her after conducting a legitimate investigation sparked by her own hostile conduct.

Despite this evidence, Green claims that Sterling discriminated against her when Laura Naumann, Sterling's human resources manager, focused the investigation on black women. She cites two facts as evidence of this: (1) Naumann attended only the

interviews of three black women, and (2) Naumann investigated a racial incident in 1996.

As Sterling's human resources manager, Naumann was responsible for investigating complaints of harassment. To investigate Valdez's complaint, she selected Tanya Thrower, a black woman, to interview everyone in the lab – both hourly and salaried workers – and report the results to her. In addition, she chose to attend the interviews of Green, Winston, and Pat McDonald. While these women are black, she did not go to their interviews because of this. She went because (a) Valdez had named them as her harassers, and (b) numerous other workers had also identified them as problems in the laboratory. Moreover, Naumann did not attend the interviews of eight other black workers, further indicating that race did not motivate her decision to attend the three women's interviews.

Green offers no evidence of racial bias in the 1996 investigation. More specifically, she furnishes no facts about it at all.

Green contends that because Valdez's initial complaint named only Winston, and Green was not working the day of the confrontation between Valdez and Winston, Thrower's investigation of Green is evidence of discrimination. Valdez's complaint, although prompted by her confrontation with Winston, revealed a widespread problem in the laboratory and with Green. This initiated a broad investigation. Sterling interviewed everyone in the laboratory – including former workers – not just Valdez and Winston.

Green argues that Sterling's discipline of half of the black workers in the laboratory is evidence of discrimination. It is not. Statistically, the sample is too small for this to prove, or even suggest, discrimination. Thus, it shows only that Sterling disciplined those workers about whom they received numerous complaints.

4. *Sex.*

Green argues that Sterling fired her because she is a woman. She says that her claim is viable because (a) Naumann did not attend the interviews of male workers, and (b) Sterling disciplined only women. Neither suggest sex discrimination.

Naumann did not attend the interviews of twelve other women. She attended the interviews of Green, Winston, and McDonald not because they are women, but because

Valdez named them in her complaint.

Sterling disciplined only women because many workers identified only them as problems in the lab. No worker identified a man who acted the same way as Green.

5.   *Age.*

Green also contends that she was fired from her job because of her age – she was 46 years old. The only evidence she points to, however, is that younger workers made the complaints that led to her termination. Whether these workers were biased against Green is irrelevant: only Sterling's response must be non-discriminatory. It was. Green harassed younger coworkers, they complained, and Sterling fired her for violating its anti-harassment policy.

6.   *Conclusion.*

Sterling's bankruptcy may have been the result of deficient management that also allowed Green's personal guerrilla war to continue for years. Finally, it responded to years of complaints and fired Green because she harassed her coworkers in violation of it anti-harassment policy. Sterling's motion for summary judgment will be granted.

Signed August 16, 2005, at Houston, Texas.

Lynn N. Hughes   USDJ
United States District Judge